IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ODERE RAZAK SULEITOPA

    *Petitioner*,

    v.

UNITED STATES OF AMERICA,

    *Respondent*.

Criminal No. ELH-16-00168
Related Civil No. ELH-19-1933

## MEMORANDUM OPINION

This Memorandum Opinion resolves a motion to vacate filed under 28 U.S.C. § 2255.

On April 21, 2016, a grand jury in the District of Maryland charged Odere Razak Suleitopa with eighteen counts of Wire Fraud, in violation of 18 U.S.C. § 1343, and five counts of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1). The matter proceeded to trial on October 24, 2016, before the Honorable J. Frederick Motz.[1] On October 27, 2016, the jury returned verdicts of guilty as to all twenty-three counts.

On March 10, 2017, Judge Motz sentenced Suleitopa to a total of thirty-nine months of incarceration with respect to the Wire Fraud charges (Counts One to Eighteen), and to twenty-four months, consecutive, as to the Aggravated Identity Theft offenses (Counts Nineteen through Twenty-Three). Thus, defendant received a total sentence of 63 months of incarceration. The court also ordered defendant to pay restitution to the victims of the fraud, in the amount of $143,169.76.

Thereafter, Suleitopa appealed to the United States Court of Appeals for the Fourth Circuit. On March 7, 2018, the Fourth Circuit affirmed. *United States v. Suleitopa*, 719 Fed. App'x 223 (4th Cir. 2018) (per curiam); *see also* ECF 133. The mandate issued on March 29,

---

[1] The case was reassigned to me on July 1, 2019, due to the retirement of Judge Motz.

2018.  ECF 134.  Suleitopa's petition for a writ of certiorari to the Supreme Court was denied on or about October 3, 2018.  *See* Docket.

On July 1, 2019, Suleitopa, who is now self-represented, filed a motion to vacate, pursuant to 28 U.S.C. § 2255, claiming ineffective assistance of trial and appellate counsel.  ECF 135.  He has also submitted a memorandum of law (ECF 135-1) and an Affidvit of Petitioner.  ECF 135-2.  I shall refer to ECF 135 and ECF 135-1 collectively as the "Petition."  The government opposes the Petition.  ECF 137.  It urges dismissal on the ground that the Petition is untimely.  Alternatively, it maintains that the Petition lacks merit.  Petitioner has replied.  ECF 138.

Under 28 U.S.C. § 2255(b), the Court must hold a hearing "[u]nless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief...."  *See*, *e.g.*, *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004).  This is such a case; no hearing is necessary.  For the reasons that follow, I shall deny the Petition.

## I.  Factual Background

### A.  The Trial

In November 2015, a senior global investigator with Walmart Stores, Incorporated ("Walmart") reviewed transaction records and video surveillance with respect to several fraudulent transactions at Walmart stores located in Virginia, Delaware, and Maryland.  Joint Appendix ("JA") 450, 464, 701-18.[2]  These fraudulent transactions were similar in several ways:

---

[2]  In its submission, the government cited to the Joint Appendix ("JA") and the Supplemental Joint Appendix ("SJA"), which were submitted to the Fourth Circuit in connection with the appeal.  At the request of this Court (ECF 139), the government provided the Court with a "hard copy" of the appendices.

The JA consists of two volumes.  Volume I contains pages 1 to 425.  Volume II contains pages 426 to 744.  In other words, the pages are numbered consecutively.  These numbers appear at the bottom of each page.

(1) the transactions were all conducted by a black male; (2) on each occasion, the individual wore "a distinctively large wide-brimmed hat" (ECF 137 at 2); (3) the suspect usually wore a black Nike track suit with a white stripe; (4) the transactions all involved purchases of gift cards with values loaded on them, usually between $900 and $1000; (6) generally, the transactions involved purchases of "high-end electronics (*e.g.* iPad Airs or PS4 gaming systems)," ECF 137 at 2; (6) the magnetic stripes on the backs of the cards used to complete the transactions did not function; (7) consequently, the cashier had to enter manually the account number on the front of the card; (8) multiple transactions were conducted consecutively and, if a card was declined, the individual provided another card; and (9) all of the account numbers came from accounts that had been compromised.  JA 474-93, 701-18.  Between October and November 2015, the suspect engaged in nineteen additional transactions in Maryland, Delaware, and Virginia, totaling $39,574.68.

On November 20, 2015, Walmart sent an email to the asset protection unit at the Walmart store in Easton, Maryland and requested search queries through Walmart's database for high dollar transactions involving gift cards, as well as video surveillance of the transactions referenced above.  JA 185-86.  In response, Scott Burgess, who worked in asset protection at the Easton Walmart, recovered the transaction records and video surveillance.  JA 185-88, 190, 192-206, 208-14.  In reviewing the information, Burgess noted that the suspect wore sunglasses and kept his head down during the transactions, which helped to conceal his face.  *Id.*

Burgess met with Easton Police Department Detective Milton Orellana on November 20, 2015.  JA 189-90, 206.  Detective Orellana and Burgess subsequently spoke with Moses Smith,

---

The SJA also consists of two volumes.  Again, the government's page numbers appear at the bottom of each page.  But, these volumes are numbered separately, not consecutively.  Therefore, with regard to the SJA, I must also reference the particular volume.

the Walmart employee who had processed eleven transactions for the suspect on November 17, 2015.  JA 109-10, 207, JA 279-82, 294-95.  Orellana and Burgess asked Smith to inform them if the suspect returned to the store.  JA 206-08, 273-93, 294-95.

At approximately 5:30 p.m. that day, November 20, 2015, the defendant, dressed in black clothing and wearing a large, wide-brimmed hat, approached Smith, who was at a cash register, and asked Smith if he was open.  JA 296, 720-21.  Smith recognized the defendant by his accent. He advised the defendant the he was going on break, and the defendant asked him, "How long?" JA 297.  Smith replied, "About 15 minutes."  *Id.*  The defendant then pushed his shopping cart to the side and left.  *Id.*

Smith promptly informed his assistant manager to notify Burgess that the same individual who had conducted the transactions in question three days earlier had returned to the store.  JA 217-22, 296-303.  Smith provided a description to Burgess of what the suspect was wearing and the area where Smith had last seen him.  JA 220, 298-99.  Smith then left the store.  At that time, he again saw the defendant, and immediately returned to the store to notify Burgess.  JA 220-21, 300-01.

Police Officer (P.O.") Toby Hafer, of the Easton Police Department, arrived at the scene, followed by P.O. Heather Hanson.  JA 44-49, 71, 73.  The officers made contact with the defendant, who was in the driver's seat of a vehicle.  Gbolahon Ishola Jubril was in the passenger seat.  JA 49-51.

The defendant, a lawful permanent resident from Nigeria (ECF 137 at 13), was then 32 years-old, is approximately six feet tall, and he weighed 177 pounds.  Supplemental Joint Appendix ("SJA"), Vol. II at 3, 16.  According to the government, Mr. Jubril was 53 years-old, five feet and seven inches tall, and "heavy set."  ECF 137 at 5.

When Detective Orellana arrived on the scene, Burgess confirmed that the defendant was the same individual who had consummated the fraudulent transactions with Smith. JA 230-31. Both the defendant and the passenger were directed to exit their vehicle. JA 47-52, 230. As the defendant opened the car door to speak with PO Hanson, the officer noted a faint odor of marijuana. In response to an inquiry, the defendant denied that he had smoked marijuana. JA 74-76. However, PO Hanson observed that the defendant had bloodshot eyes and dilated pupils. JA 75. The defendant orally consented to the search of his vehicle. JA 76. He and the passenger were then placed in different police vehicles.

During the search of the vehicle, PO Hanson located a black Nike track jacket with a white stripe and a wide-brimmed hat. JA 78-79. These items matched the verdict and hat worn by the suspect, as depicted on surveillance footage. From the center console, PO Hanson seized two Swiss Gear wallets, one black and one plaid. JA 80. She also recovered two cell phones from the "center stack," *i.e.*, "the area under the heating/air and radio controls by the gear shift where there is a little cubby hole." ECF 137 at 6; JA 80.

At headquarters, PO Hanson searched the wallets and inventoried their contents. JA 81. The black wallet contained the following: a Royal Caribbean (Bank of America) Visa card in the name of Odere R. Suleitopa, ending in 6560; an NFL Visa card in the name of Odere R. Suleitopa, ending in 5787; a First Premier Bank MasterCard card in the name of Odere R. Suleitopa, ending in 0637 and missing a chip; a First Premier Bank MasterCard card in the name of Odere R. Suleitopa, ending in 3813; a Target gift card; and eight $1.00 bills. JA 81, 125-27. The plaid wallet contained the following: a Chase Freedom Visa card in the name of Odere R. Suleitopa, ending in 4001; a Chase Visa card in the name of Odere R. Suleitopa, ending in 3479; a Chase Ink Visa card in the name of Odere R. Suleitopa, ending in 5990; a Royal Caribbean

(Bank of America) Visa card in the name of Odere R. Suleitopa,  ending in 5057; and fifty-three $20 bills, fifty of which were bound together, for a total of $1,060.  JA 81-82, 121, 124-25.

Mr. Jubril, the passenger in the vehicle, was interviewed and released that night.  He was not charged with any offenses.  JA 118.  The defendant was also released without being charged. JA 128-29.

A few weeks later, investigators confirmed that the credit cards used by the defendant on November 10, November 16, and November 17 of 2015 were "flagged" for fraudulent activity. ECF 137 at 6 (citing JA 127-29).  The investigation revealed that each card seized from the defendant's wallets had a bank identification number ("BIN") that did not match the card.  JA 124-28, 518-26, 722-24.  For example, the Bank of America Visa Signature Royal Caribbean card was embossed with BIN number 447753.  JA 125-16, 722-24.  But, that BIN number had been issued by Nusenda Credit Union, formerly known as the New Mexico Educators Federal Credit Union.  JA 125-26, 722-24.

Both cell phones were submitted for forensic analysis.  But, one was locked, and therefore it could not be analyzed.  JA 120.  Analysis of the other cell phone, an Alcatel, resulted in the recovery of a text message with two sets of numbers, both four digits long, which coincided with the last four digits of two of the fraudulent cards in the defendant's possession on November 20, 2015.  JA 120.  There was also a reference to $9,900 and $20,600.  *Id.*

On January 14, 2016, the defendant was charged in Talbot County, Maryland with 16 counts related to credit card fraud and theft.  An arrest warrant was issued.  JA 120-28, 132. Prior to the filing of those charges, the defendant engaged in several additional fraudulent transactions in Massachusetts.

In particular, on December 23, 2015, at the Walmart store in Gardner, Massachusetts, the defendant, wearing a wide-brimmed floppy hat and a dark sweater, and using a New York driver's license as identification, completed two transactions and attempted a third. JA 336-48, 378-80, 725-27. The defendant was able to buy two video game systems and four $900 gift cards using fraudulent credit cards, and the total amount charged was $4,342.65. JA 336-48, 378-80, 448, 725-27. After the defendant left the store, the assistant manager contacted Ms. Canu, the loss prevention officer, to review the transactions that the defendant had just completed. JA 340-41. Ms. Canu confirmed that they were fraudulent. *Id.*

And, on January 13, 2016, one day before the Maryland charges were filed, the defendant returned to that same Walmart store in Gardner, Massachusetts, again wearing a wide-brimmed hat. JA 349-50, 728-29. Ms. Canu recognized the defendant. JA 348-49. Suleitopa attempted to purchase two $900 gift cards and a few DVDs, but the transaction was declined. JA 349-51. Thereafter, at approximately 4:50 p.m., the defendant left the store. JA 351-52. Ms. Canu followed and contacted the Gardner Police Department at approximately 4:51 p.m. JA 351-54, 432.

A few minutes later, police officers from the Gardner Police Department responded, and Ms. Canu directed them to the employee parking lot, where the defendant was sitting in a silver vehicle. JA 353-55, 433-35. Ms. Canu identified the defendant to the officers, prompting the defendant to remark that she did not see him do anything, nor did he take anything. JA 356-57.

The police officers identified the defendant through his New York driver's license. JA 437. The defendant was with another individual, identified as Olsola Fakolujo. JA 438-49. The defendant told the officers that he had gotten lost driving his friend from Brooklyn, N.Y. to Providence, R.I. But, Gardner is not on the way from Brooklyn to Providence. JA 438. The

defendant was arrested, but Mr. Fakolujo was permitted to leave and was not charged.  JA 440-42.

Arrangements were made to tow the vehicle, which was a rental vehicle, from the Walmart parking lot.  JA 440-42.  Prior to towing, an inventory search was conducted, pursuant to Gardner Police Department policy.  JA 442-43.  During the inventory, officers located the hat that the defendant had been wearing, as well as pieces of multiple cut up credit cards embossed with the defendant's name, found in a cup that contained soda.  JA 443-45.

The defendant was charged with attempt to commit larceny over $250 in connection with the attempted credit card transaction on January 13, 2016.  JA 449.  On March 15, 2016, the defendant pleaded guilty to that offense.  JA 449.

Thereafter, the defendant was extradited to Maryland, where he made his initial appearance on April 12, 2016, on the charges pending in a criminal complaint.  ECF 4.  On April 21, 2016, the grand jury returned a 23-count indictment.  ECF 10.  Motions were heard on October 14 and October 21 of 2016.  ECF 50; ECF 59.

At trial, in addition to the evidence recounted above, the government called a senior global investigator with Walmart to review the approval process for transactions completed with credit cards, which cause wires to travel in interstate commerce.  JA 451-56.  One of the victims whose account was compromised also testified, and stipulations were read regarding other accounts.  JA 409, 162-65, 448-49, 565-66.

Special Agent John Van Wie, of the Department of Homeland Security, testified about the investigation, such as gathering evidence, contact with the various financial institutions and individual victims, as well as Walmart to acquire necessary information related to the cards and the transactions.  JA 509-29.  Agent Van Wie spent eight to ten hours reviewing video

surveillance from the various Walmart stores to ensure it coincided with the transaction times from the receipts, and also identified still shots from those videos, which were then used to create exhibits, including summary exhibits.  JA 509-36, 676-729; ECF 137 at 10 (citing government exhibits MD1 to MD7, MD 20-22, S1, S2).

During Agent Van Wie's testimony, he reviewed the government's Summary Exhibit 1, and discussed the Nike striped track jacket that had been seized in Easton on November 20, 2015.  JA 509.  He also described the jacket worn by the suspect in regard to fraudulent transactions in Virginia, Delaware, and Maryland and noted that "the suspect" in those instances was wearing clothes that matched the clothes seized by the Easton Police Department on November 20, 2015.  JA 509-10, Agent Van Wie referred to the individual as either "the suspect," "he," or "him," because the suspect was a male.  JA 509-10, 517.

The defendant lodged four objections concerning Agent Van Wie's references to the individual suspected of the crime.  After overruling each objection, and denying defendant's motion for a mistrial, Judge Motz provided a limiting instruction to the jury:

1) THE COURT:  Overruled.  Obviously it's up to you [*i.e.*, the jury] to determine the identity.  JA 509.

2) THE COURT:  No, no.  Obviously he's describing what is seen, but these are jury questions.  Go ahead.  JA 510.

3) THE COURT:  That's for you all to determine.  JA 516.

4) THE COURT:  Now, obviously it's up to you [*i.e.*, the jury] to determine whether it's the same clothes.  JA 517.

The defendant did not present a defense case.  During jury instructions, the court provided the standard jury instruction as to presumption of innocence, as well as instructions requested by the defendant related to identification testimony.  JA 576, 587-88, 592-94. Regarding identification, the court instructed the jury as follows, JA 592-93:

9

One of the most important issues in this case is the identification of the defendant as a perpetrator of the -- as a perpetrator of the crime. The government has the burden of proving identity beyond a reasonable doubt. It is not essential that the witness be free from doubt as to the correctness -- it is not essential that the witness himself -- and I'm going to say "himself." Just infer that, whenever I say, "himself," I mean himself or herself -- as to the correctness of his identification of the defendant. However, you must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. You are -- if you are not convinced beyond a reasonable doubt that the defendant was a person who committed the crime, you must find the defendant not guilty.

Identification testimony is an expression of belief on the part of the witness. Its value depends upon the opportunity the witness had to observe the offender at the time of the offense and later to make a reliable identification of the offender.

Now, you will hear arguments of counsel on this subject, and I will not repeat them here. I will only suggest to you that you should consider the following matters: Did the witness have the ability to see the offender at the time of the offense? Has the witness' identification of the defendant as the offender been influenced in any way? Has his identification been unfairly suggested by events that occurred since the time of the offense? Is his recollection accurate?

In addition, you should consider the credibility of the identification witnesses just as you would -- just as you do all the other witnesses.

Let me repeat: The burden is on the prosecution to prove every essential element of the crime charged, including the identity of the defendant as the offender. Therefore, if, after examining all of the evidence, you find that the crime was committed, but you have a reasonable doubt about whether it was the defendant who committed the crime, then you must find him not guilty.

In closing argument, defense counsel emphasized identification testimony. Defendant's

attorney argued, JA 643-44:

So you learned that identifications are important. Identifications from eyewitnesses are important. You also heard some identifications that don't matter for your deliberations.

You saw Special Agent Van Wie testify. He has no personal knowledge whatsoever of anything in this case. He watched some videos. They're the same videos you watched. Agent Van Wie's opinion has no bearing on the question of whether Mr. Suleitopa conducted those transactions. And you know this because

Judge Motz told you that.  He said that's up to you to decide.  No witness can tell you that.  That's for you.

Defense counsel subsequently returned to the issue of identification and argued a failure

of proof, stating, JA 651-52:

> You have to consider all of these factors in evaluating that identification…. Proof beyond a reasonable doubt is the highest standard in the law. The government gave you one unreliable identification and deprived you of four reliable identifications. If the four best people to answer the question of whether they got the right guy can't do it, how can you? Reasonable doubt can arise from the lack of evidence.
>
> At the start of this trial, Mr. Suleitopa sat before you an innocent man. As he sits before you now, he is an innocent man. And, when you go back to deliberate, he remains an innocent man.
>
> When you weigh all the evidence and the lack of evidence and the lack of a single reliable eyewitness identification, and the lack of any evidence about the name that was on the cards in this case, and when you hold the government to its burden and follow the Judge's instructions, there is only one verdict: Not guilty.

In rebuttal, the prosecution reminded the jury of the court's instructions regarding proof

beyond a reasonable doubt and the presumption of innocence, and stated, JA 653:

> That with regard to that burden beyond a reasonable doubt, we don't shrink from that burden. We love that burden. It's one of the cornerstones of our system. And the presumption of innocence, we don't shrink from that, that's true. But when you go back to deliberate and consider this evidence and weigh it against the instructions the Court just gave you, you end up coming to a conclusion or verdict, really everything we've done in this courtroom since Monday is about that, very simple verdict, facts as you determine them to be, plus the law, which the Judge just gave, you put them together, you get your verdict.
>
> When you do that in the deliberations process when you begin deliberating in this case, you'll realize that the defendant has been stripped of the presumption of innocence and his guilt has been laid bare.

As noted, the jury convicted the defendant of all 23 counts in the Indictment.  In

particular, the defendant was convicted of Wire Fraud, in violation of 18 U.S.C. § 1343 (Counts

One – Eighteen), and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1) (Counts

Nineteen – Twenty-Three).  JA 730-35.

Additional facts are included in the Discussion.

## B.  Sentencing

Sentencing was held on March 10, 2017.  ECF 106; JA 7, 736-42.  The Amended

Presentence Report ("PSR") is docketed at ECF 107.

The parties agreed that the loss was $191,873.09, and that defendant had an adjusted base

offense level of 19.  SJA, Vol. 1 at 4-5; SJA, Vol. II at 12.  In addition, the defendant, a lawful

permanent resident from Nigeria, had six criminal history points, based on convictions in 2014

and 2015 for access device fraud and credit card fraud in Pennsylvania, New Jersey, New York,

and Massachusetts.  SJA, Vol. II at 3, 13-15.  Given a criminal history category of III, the

advisory sentencing guidelines range called for a period of incarceration for wire fraud of 37 to

46 months, plus 24 months, consecutive, as to the convictions for aggravated identity theft.  SJA,

Vol. I at 4-5.  The parties agreed that an aggregate sentence of between 63 and 66 months of

incarceration was the appropriate disposition.  SJA, Vol. I at 4-5.[3]

Judge Motz sentenced the defendant to the bottom of the agreed upon range:  39 months

for Counts One through Eighteen, *i.e.*, the Wire Fraud counts, and to the mandatory term of 24

months, consecutive, with respect to Counts Nineteen through Twenty-Three, *i.e.*, the

Aggravated Identity Theft counts.  This resulted in an aggregate sentence of 63 months.  *See*

---

[3] The government claims that the defendant also agreed to waive his right to appeal the sentence.  ECF 137 at 13.  It cites SJA, Vol. I at 4-5.  However, I found no indication of such an agreement on those pages.  And, at the end of sentencing, Judge Motz said:  "Anybody believes I've erred they have a right to appeal.  And you have a right to appeal from your convictions."  SJA, Vol. I at 12.

ECF 112 (Judgment); ECF 113 (Statement of Reasons); *see also* JA 736-42; SJA, Vol. I at 11-12.  He also ordered restitution in the amount of $143,169.76.  ECF 112; JA 741.

## C. Appeal

The defendant noted an appeal.  ECF 114.  On March 7, 2018, in an unpublished per curiam opinion, the Fourth Circuit affirmed.  *United States v. Suleitopa*, 719 F. App'x 233 (4th Cir. 2018) (per curiam); *see also* ECF 133.  The mandate issued on March 29, 2018.  ECF 134.

The Fourth Circuit found the opinion testimony of Van Wie was a lay witness was properly admitted under Rule 701 of the Federal Rules of Evidence on the issue of identity, and therefore the district court properly denied the defendant's motion for a mistrial on that basis.  Further, although the government improperly argued in closing argument that the jury would find that the defendant had been stripped of the presumption of innocence, the defendant failed to show that the isolated remark, to which there was no objection, "prejudicially affected his substantial rights so as to deprive him of a fair trial."  *Suleitopa*, 719 F. App'x at 237.

The defendant petitioned the Supreme Court for a writ of certiorari.  It was denied on October 3, 2018.  *See* Docket.

## II. Section 2255 Generally

Pursuant to 28 U.S.C. § 2255(a), a prisoner in federal custody may "move the court which imposed the sentence to vacate, set aside or correct the sentence," but only on certain grounds: "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. . . ."  *See Hill v. United States*, 368 U.S. 424, 426-27 (1962); *United States v. Hodge*, 902

F.3d 420, 426 (4th Cir. 2018); *United States v. Middleton*, 883 F.3d 485 (4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015).

In particular, the Petitioner must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). Notably, "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill*, 368 U.S. at 428).

Claims previously litigated on direct appeal are generally not cognizable under § 2255. *Schlup v. Delo*, 513 U.S. 298, 318-19 (1995). As the Court said in *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976), a petitioner "will not be allowed to recast, under the guise of a collateral attack, questions fully considered" and decided on direct appeal.

On the other hand, a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, ___ U.S. ___, 136 S. Ct. 1737, 1758 (2016) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)). Thus, any failure to raise a claim on direct appeal generally constitutes a procedural default that bars presentation of the claim on post-conviction review, unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he complains," or "actual innocence." *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010) (citing *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999)); *see United States v. Frady*, 456 U.S. 152, 165 (1982); *Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Reed v. Farley*, 512 U.S. 339, 354 (1994) (stating

that where the petitioner "failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged . . . violation.'") (citation omitted).

In other words, as a general rule, a petitioner who fails to raise a claim on direct appeal is barred from raising the claim on collateral review. *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 350–51 (2006). However, this bar ordinarily does not apply to claims pertaining to ineffective assistance of counsel. *See, e.g.*, *Massaro v. United States*, 538 U.S. 500, 509 (2003). This is because such claims ordinarily are not litigated on direct appeal. Claims of ineffective assistance are cognizable on direct appeal "only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010); *see also United States v. Ladson*, 793 Fed. App'x 202 (4th Cir. 2020) (per curiam). Instead, claims of ineffective assistance of counsel are litigated in a § 2255 action, to allow for development of the record. *Massaro*, 538 U.S. at 504-06; *Ladson*, 793 Fed. App'x at 202.

If the "cause and prejudice" standard applies, the petitioner must show: (1) cause for not raising the claim of error on direct appeal; and (2) actual prejudice from the alleged error. *Bousley*, 523 U.S. at 622; *see also Dretke*, 541 U.S. at 393; *Reed*, 512 U.S. at 354; *Frady*, 456 U.S. at 167-68.

To show cause for failure to raise a claim of error on direct appeal, a petitioner must prove that "some objective factor external to the defense such as the novelty of the claim or a denial of effective assistance of counsel" impeded efforts to raise the issue earlier. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *see also Carrier*, 477 U.S. at 492 ("[C]ause . . . requires a showing of some external impediment preventing counsel from constructing or raising the claim."); *Mikalajunas*, 186 F.3d at 493 (movant must demonstrate "something external to the

defense, such as the novelty of the claim or a denial of effective assistance of counsel").
Additionally, the alleged error cannot simply create "a *possibility* of prejudice," but must be
proven to work to the petitioner's "*actual* and substantial disadvantage, infecting his entire trial
with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original).   Put
another way, prejudice does not support relief from a procedural default, in the absence of a
showing of cause.   *Carrier*, 477 U.S. at 494; *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

The actual innocence exception "only applies in limited circumstances." *United States v.
Jones*, 758 F.3d 579, 583 (4th Cir. 2014).   In the context of a habeas case under 28 U.S.C. §
2254, the Fourth Circuit has said:[4] "A valid actual innocence claim 'requires petitioner to support
his allegations of constitutional error with new reliable evidence – whether it be exculpatory
scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not
presented at trial.'" *Finch v. McKoy*, 914 F.3d 292, 298 (4th Cir. 2019) (quoting *Schlup*, 513
U.S. at 325).   Moreover, a petitioner must "'demonstrate that the totality of the evidence would
prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his
incarceration is a miscarriage of justice.'" *Finch*, 914 F.3d at 298 (quoting *Teleguz v. Pearson*,
689 F.3d 322, 329 (4th Cir. 2012)).   It is an "exacting standard," based on a "'holistic judgment
about all the evidence'. . . ." *Finch*, 914 F.3d at 299 (quoting *House v. Bell*, 547 U.S. 518, 539
(2006)).

In order to show "actual innocence," then, the petitioner "must demonstrate actual factual
innocence of the offense of conviction, *i.e.*, that petitioner did not commit the crime of which he
was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not

---

[4] "[T]he grounds for relief under § 2255 are equivalent to those encompassed by § 2254
[and] § 2255 was intended to mirror § 2254 in operative effect." *Davis v. United States*, 417
U.S. 333, 344 (1974).

factually, innocent." *Mikalajunas*, 186 F.3d at 494 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)); *see also Bousley*, 523 U.S. at 623. Moreover, the petitioner must meet his burden by clear and convincing evidence. *Mikalajunas*, 186 F.3d at 494. In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Jones*, 758 F.3d at 583 (emphasis added); *see Bousley*, 523 U.S. at 623.

In resolving the Petition, I am mindful that a self-represented litigant is generally "held to a 'less stringent standard[ ]' than is a lawyer, and the Court must liberally construe his claims, no matter how 'inartfully' pled." *Morrison v. United States*, RDB-12-3607, 2014 WL 979201, at *2 (D. Md. Mar. 12, 2014) (internal citations omitted); *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Bala v. Commonwealth of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (per curiam) (same).

### III. Ineffective Assistance of Counsel

The Sixth Amendment to the Constitution guarantees a criminal defendant the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, ____ U.S. ____, 137 S. Ct. 759, 775 (2017). Ineffective assistance of counsel is a well recognized basis for relief under § 2255. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. Akande*, ___ F.3d ___, 2020 WL 1907768, at *2 (4th Cir. Apr. 20, 2020); *United States*

*v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 137 S. Ct. at 775; *Chaidez v. United States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149; *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013).

The first prong is known as the "performance prong," which relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland,* 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Powell*, 850 F.3d at 149. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has said that the "first prong sets a high bar." *Buck*, 137 S. Ct. at 775; *see also Powell*, 850 F.3d at 149. In *Padilla*, the Court said, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task." Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 137 S.Ct. at 775 (citation omitted). Consequently,

the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687). Notably, "the *Strickland* standard must be applied with scrupulous care," *Richter*, 562 U.S. at 105, and "the standard of judging counsel's representation is a most deferential one." *Id.* Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697.  Nor must a court address both components if one is dispositive.  *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim.  As a result, "there is no reason for a court...to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

The standard outlined above applies to both trial and appellate counsel.  *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2011) (applying *Strickland* to appellate proceedings); *see Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).  Notably, "[c]ounsel is not obligated to assert all nonfrivolous issues on appeal, as '[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review.'"  *Bell*, 236 F.3d at 164 (quoting *Jones v. Barnes*, 463 U.S. 745, 752 (1983)); *see also Smith v. So. Car.*, 882 F.2d 895, 899 (4th Cir. 1989) (recognizing that counsel's failure to raise a weak claim may constitute an acceptable strategic decision "to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims").

"Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of [appellate] counsel be overcome."  *Gray v. Green*, 800 F.2d 644, 646 (7th Cir. 1986).  In other words, counsel should focus on issues "'most likely to afford relief on appeal.'"

## IV. Discussion

### A.

As an initial matter, the government contends that Petitioner's claims are time barred. ECF 137 at 16.  This claim is without merit.

Congress has provided for a one-year period of limitation for motions under 28 U.S.C.

§ 2255.  This limitation period runs from the latest of, *id*.:

> (1) the date on which the judgment of conviction becomes final;

> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.  *Id.*

The government maintains that Petitioner's claims of ineffective assistance of counsel are time-barred because Suleitopa was "present in court when the defense rested without calling the alibi witness he now asserts should have been called, and also presented during the government's closing argument, a ground raised and rejected by the Fourth Circuit."  ECF 137 at 17.  On this basis, argues the government, the claims are time-barred, and the petition should be dismissed. *Id.*  The government is mistaken.

The one-year period runs from the *latest* of the four potential starting points, set forth above.  As the government notes, the Supreme Court denied certiorari on October 3, 2018.  ECF 137 at 2.  The Petition was filed on July 1, 2019, within a year of that date.  *See* ECF 135.

The Supreme Court expressly said in *Clay v. United States*, 537 U.S. 522, 525 (2003): "For the purpose of starting the clock on § 2255's one-year limitation period, we hold, a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction."  *See id.* at 532.  And, because a petition or certiorari was filed, the "criminal conviction becomes final at the end of the appellate

process…."  *United States v. Oliver*, 787 F.3d 120, 125 (4th Cir. 2017).   As indicated, the process ended, and the conviction became final, when certiorari was denied by the Supreme Court on October 3, 2018. *United States v. Bennerman*, 785 Fed. App'x 958, 960 (4th Cir. 2019) (per curiam); *United States v. Segers*, 271 F.3d 181, 186 (4th Cir. 2001).

Thus, the Petition was timely filed.

## B.

The Petition presents three grounds:  (1) ineffective assistance of trial counsel for failure to object to the prosecutor's remarks in rebuttal concerning the "presumption of innocence", ECF 135 at 4; (2) ineffective assistance of trial counsel for failure to investigate an alibi witness, *id.* at 5; and (3) ineffective assistance of appellate counsel for failure to argue that "a stricter, more heightened standard of review" applied because of prosecutorial misconduct in regard to the effort to deprive defendant of the presumption of innocence.  *Id.* at 6.

## 1.

In Ground One, Suleitopa contends that his trial counsel was ineffective in failing to object to the prosecutor's statement during rebuttal that defendant had been "stripped of the presumption of innocence."   And, he argues in Ground Three that his appellate counsel performed deficiently by failing to establish the appropriate standard for appellate review of the error.

At trial, the government argued in rebuttal, J.A. 653 (emphasis added):

That with regard to that burden beyond a reasonable doubt, we don't shrink from that burden. We love that burden. It's one of the cornerstones of our system. And the presumption of innocence, we don't shrink from that, that's true. But when you go back to deliberate and consider this evidence and weigh it against the instructions the Court just gave you, you end up coming to a conclusion or verdict, facts as you determine them to be, plus the law, which the Judge just gave, you put them together, you get your verdict. *When you do that in the deliberations process when you begin deliberating in this case, you'll realize that*

*the defendant has been stripped of the presumption of innocence and his guilt has been laid bare.*

The prosecutor's statement was made in response to the defendant's accusation that the government had failed to meet its burden of proof.   In closing argument, defense counsel argued that defendant retained his presumption of innocence throughout the jury's deliberations.   In rebuttal, the government responded that when the jury considered the evidence, the facts, and the law, it would find that the defendant was not innocent, and deem him guilty. *Id.* Clearly, it was the government's position that the proof in this case had established the defendant's guilt beyond a reasonable doubt, and it urged the jury to reach that conclusion.

Notably, in the instructions to the jury, Judge Motz carefully explained the burden of proof.   *See* J.A. at 583-607, 664-668.   The court advised the jury about the presumption of innocence, explaining that it "attends a defendant throughout the trial," and that the government has "the burden of overcoming this presumption" by proof "beyond a reasonable doubt…." *Id.* at 587.   He also admonished the jury that the arguments of counsel are not evidence.  JA 585.

Appellate counsel raised the issue on direct appeal, but the Fourth Circuit found no prejudice.  *Suleitopa*, 719 F. App'x at 237.   Although the issue was raised, defendant asserts that appellate counsel rendered ineffective assistance in regard to the standard of review.

On appeal, the Fourth Circuit applied plain error review, because the issue was not preserved.   However, defendant complains that because the prosecutor engaged in "purposeful" misconduct, ECF 135-1 at 23, his appellate lawyer committed a "critical error of failing to argue that a different, stricter standard of appellate review was applicable." *Id.*   He maintains that appellate counsel should have "argued that a more heightened standard of review was applicable," rather than the standard of fundamental fairness, given that the prosecutor "eviscerated" the presumption of innocence. *Id.* at 24.

The government posits that "the prosecutor's statement did not have the effect of misleading the jury into believing the defendant's innocence was actually extinguished without their deliberative examination of the overwhelming evidence against the defendant."  ECF 137 at 19.  Further, the government observes that "this isolated statement did not overshadow or erase repeated instructions from the judge regarding the presumption of innocence; instructions which made clear to the jury their duty to consider the evidence presented at trial, 'not the statements and arguments of counsel.'"  *Id.* (citation omitted).  Moreover, based on the Fourth Circuit's ruling, the government contends that any claim of error "necessarily fails."  *Id.*

I agree with the government that trial counsel's failure to object to the singular remark of the government during rebuttal does not establish a viable claim under § 2255.  For one thing, the remark was isolated and ignores the significance of the court's jury instructions.  And, in light of the overwhelming evidence against Petitioner, there was no prejudice.  *Cf. United States v. Benson*, ___ F.3d ___, 2020 WL 1966843, at *9 (4th Cir. Apr. 24, 2020).

In *Benson*, 2020 WL 1966843, the defendant claimed that the government's closing argument constituted prosecutorial misconduct by referencing a codefendant's statement, which was admissible only as to the codefendant.  Although the Court noted that the government came close to making an improper argument, *id.* at *9, it rejected the claim of prosecutorial misconduct.  *Id.*

The Court observed that when a defendant alleges prosecutorial misconduct, "it must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id.* (quoting *United States v. Caro*, 497 F.3d 608, 624 (4th Cir. 2010).  In particular, "'the defendant must show 1) that the prosecutor's remarks or conduct were improper and 2) that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair

trial.'"  *Benson*, 2020 WL 1966483, at *3 (quoting *Caro*, 597 F.3d at 624) (some quotation marks omitted).

Although in this case there was no curative jury instruction, the district court instructed the jury on the presumption of innocence.  And, the jury was also told that arguments of counsel are not evidence.  ECF 132 at 42.  There is no basis to find that the jury disregarded the court's instructions.  And, as indicated, the evidence of guilt was overwhelming.

Moreover, plain error review was appropriate on appeal.  *See United States v. Baptiste*, 596 F.3d 214, 220, 226 (4th Cir. 2010).  On plain error review, the defendant bears the burden of persuasion to present an "'error' that is 'plain' and that 'affect[s] substantial rights.'"  *United States v. Olano*, 507 U.S. 725, 731-32 (1993) (alteration in *Olano*); *see United States v. Hastings*, 134 F.3d 235, 240 (4th Cir. 1998); *see also* Fed. R. Crim. P. 52(b).  The error must be one that "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *Olano*, 507 U.S. at 732 (citation omitted) (alteration in *Olano*).  In other words, a court will not correct the error "'unless a miscarriage of justice would result or the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence.'"  *United States v. Johnson*, 219 F.3d 349, 353 (4th Cir. 2000) (quoting *United States v. Cedelle*, 89 F.3d 181, 184 (4th Cir. 1996)).

In regard to closing argument, claims of prosecutorial misconduct require that the defendant show that the remarks "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial."  *Baptiste*, 596 F.3d at 226 (citations and quotation marks omitted).  Under this analysis, the Fourth Circuit determined that although the prosecutor misstated the law, the isolated misstatement did not prejudice the defendant, given the jury instructions on the presumption of innocence.  *Suleitopa*, 719 Fed. App'x at 236.

As indicated, claims previously litigated on direct appeal are generally not cognizable under § 2255. *Schlup*, 513 U.S. at 318-19.   In *Boeckenhaupt*, 537 F.2d at 1183, the Fourth Circuit said that a petitioner "will not be allowed to recast, under the guise of a collateral attack, questions fully considered" and decided on direct appeal.   This principle applies here.

## 2.

In Ground Two, defendant claims that trial counsel failed to investigate an alibi witness, Yetunde Adesanya, and this omission amounted to ineffective assistance of counsel.   To support his claim, defendant cites case law that supports the general concept that counsel's failure to investigate a witness may be grounds for a claim of ineffective assistance.   But, he fails to provide evidence to support the existence of this alibi witness, nor does he show that the testimony would have altered the outcome of his trial.

"The focus in failure-to-investigate claims ... is the reasonableness of the investigation (or lack thereof)." *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010). Defense counsel's decision not to call a witness is not per se ineffective, and is subject to the same level of deference for counsel's discretion as other claims of ineffective assistance. *DeCastro v. Branker,* 642 F.3d 442, 452 (4th Cir. 2011); *see Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998) ("The Sixth Amendment ... does not always compel counsel to undertake interviews and meetings with potential witnesses where counsel is familiar with the substance of their testimony.").   Indeed, the court "give[s] counsel wide latitude in determining which witnesses to call as part of their trial strategy." *United States v. Dyess*, 730 F.3d 354, 364–65 (4th Cir. 2013); *see Wilson v. Greene,* 155 F.3d 396, 404 (4th Cir. 1998); *Pruett v. Thompson,* 996 F.2d 1560, 1571 n. 9 (4th Cir. 1993).

In defendant's Affidavit (ECF 135-2), he explains that Ms. Adesanya had "flown in from Nigeria on 11/06/2015 … to spend time with [him]." *Id.* Further, he states that he provided contact information to his attorney, and she said: "'It is not irrelevant.'" However, defendant asserts that his lawyer also said that "it was not necessary [to call the witness] because the government could not prove [defendant's] identity as the fraudulent purchaser beyond a reasonable doubt." *Id.*

Defendant's Petition lacks any statement or accompanying affidavit from the alibi witness. Rather, the Affidavit is limited to defendant's self-serving, speculative conclusions, which are insufficient to overcome the "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Notably, the presence of a visitor from Nigeria during the relevant time would not foreclose defendant's commission of the crimes.

Even if counsel rendered ineffective assistance by failing to pursue the alleged alibi witness, there is insufficient evidence to conclude that defendant was prejudiced. At trial, the government presented extensive evidence against the defendant, by which the jury was convinced of the defendant's guilt beyond a reasonable doubt. In particular, a senior global investigator with Walmart testified as to the fraudulent transactions (JA 451-56); a victim whose account had been compromised testified to the loss experienced (JA 409, 162-65, 448-49, 565-66); and Special Agent Van Wie testified as to the steps he took to gather evidence, including contact with financial institutions and individual victims, and the acquisition of information related to the transactions. JA 502-36. The evidence showed the Nike striped jacket seized in Easton, Maryland, worn by the defendant in still shots and videos at the times of the fraudulent transactions. JA 509-10. The defendant was arrested with the large hats and clothing he wore

during the fraudulent transactions, as seen on the security cameras, and identified by Walmart employees, and he was found in possession of stolen credit cards with his name on them. JA 78-79, 712-18, 23-31, 124-27.

As the government notes, "This was a crime committed over and over again in several states; the defendant was identified leaving the store in Massachusetts and Maryland, and found in possession of incriminating evidence which linked him directly to the fraud scheme. It is exceedingly unlikely that Ms. Adesanya could provide an alibi for all of the transactions alleged in the indictment."  ECF 137 at 24.  Defendant elected not to put on a defense case, but emphasized identification during closing argument. JA 576, 651-52. His contention that the alleged alibi witness from Nigeria would have successfully generated reasonable doubt, despite the overwhelming identification evidence presented against the defendant, rings hollow.

Notably, Ms. Adesanya clearly was not with the defendant when he was arrested in Maryland.  At that time, Mr. Jubril was the only person with the defendant. Nor was Ms. Adesanya with the defendant when he was arrested in Massachusetts.  At that time, the only person in the car was Mr. Fakolujo. "Speculation about the credibility of Ms. Adesanya, [the] strength of the alibi, and unlikelihood that this single witness could provide a sound alibi for all six dates in question is only strengthened by the decision of trial counsel to proceed without this sole alibi witness."  ECF 137 at 24.  And, defendant fails to explain why the presence of Ms. Adesanya would have precluded the commission of the offenses.

I agree with the government that this alleged alibi witness was not likely to overcome "the overwhelming" evidence against the defendant.  *Id.*  Therefore, defendant fails the prejudice analysis under *Strickland*.  He cannot show that there is a reasonable probability that, but for

28

counsel's alleged error, the result of the proceeding would have been different. *See Cullen v. Pinholster,* 563 U.S. 170, 189 (2011).

### V. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant. A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding.[5] 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 773 (2017). Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

Petitioner has not made a substantial showing of the denial of his constitutional rights. Therefore, I decline to issue a COA.

An Order follows, consistent with this Memorandum Opinion.


Date:   April 28, 2020                           _____/s/_____
                                                 Ellen Lipton Hollander
                                                 United States District Judge

---

[5] The denial of a COA by the district court does not preclude Petitioner from seeking a COA from the Fourth Circuit.